## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

MATTHEW WEBB,

    Petitioner,

    v.

WARDEN WALTER WEST,

    Respondent.

Civil Action No.:  PWG-20-2654

## MEMORANDUM OPINION

Petitioner Matthew Webb filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging the validity of his conviction on charges of second-degree attempted rape and second-degree assault from the Circuit Court in Cecil County, Maryland.  ECF No. 1.  Respondent has filed an Answer asserting that some of Webb's claims are unexhausted and procedurally defaulted, and to the extent Webb asserts ineffective assistance of counsel claims, they are without merit.  ECF No. 5; ECF No. 7 (supplement to Answer).  Webb has filed a response to the Answer. ECF No. 15.  No hearing is necessary.  *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts* and Local Rule 105.6 (D. Md. 2021); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. §2254(e)(2)). For the reasons that follow, the petition shall be denied and a certificate of appealability shall not issue.

**BACKGROUND**

**A.    Trial**

On December 23, 2001, Webb contacted JE,[1] the mother of one of his children, asking her to pick him up in Chester, Pennsylvania and bring him down to Perryville, Maryland where JE lived so that Webb could spend time with his daughter for Christmas.  ECF No. 5-7 at 68, 70.  At that time, JE testified, she and Webb had been estranged for approximately four or five months.  *Id*. at 69.  JE explained that she drove to Pennsylvania as requested because Webb called repeatedly the week prior asking JE to let him come to Maryland to see his daughter.  *Id*. at 69-70.  She further stated that she thought he would stop bothering her if she relented and that Webb had made a promise not to hurt her.  *Id*. at 70.

After arriving at JE's house, JE recalled that Webb continued calling her names and then yanked his three-year old daughter "K" off of JE's lap, began shaking her and saying, "she was going to be a whore just like her mom."  ECF No. 5-7 at 73.  JE took the child away from Webb and told him not to "lay hands" on the kids: she recalled that he became enraged because he did not like for her to correct him in front of the children.  *Id*.  JE then told the children to go to bed and that they should not come back down the stairs for any reason.  *Id*.

When JE returned from escorting the children halfway up the stairs, she found Webb had retrieved a large knife from the kitchen.  ECF No. 5-7 at 73.  She testified that Webb "started poking [her] with the knife all over . . . . mostly in [her] head," demanded that she take her clothes off, and called her a whore.  *Id*. at 74.  Webb then grabbed JE by her hair and told her to perform oral sex on him while still wielding the knife.  *Id*.  JE recalled believing that Webb was going to kill her and her children because he had threatened to do so on numerous occasions.  *Id*. at 75.  JE

---

[1]      The victim's name has been redacted from the record in this case and is referred to only as "JE."

testified that she removed one leg of her pants because Webb had stabbed her in the leg and threatened to kill her. *Id*. at 77. Webb tried to have sex with JE in the living room of the apartment, but he could not maintain an erection. *Id*.

JE tried to get away from Webb by running toward the bathroom, but Webb caught her in the hallway and pushed her into the master bedroom. ECF No. 5-7 at 79. Webb, who was still holding the knife, pinned JE down on the bed with the bottom of his knees and his body weight. *Id*. JE recalled that Webb repeatedly punched and beat her every time she screamed, and that Webb raped her while holding a knife to her neck. *Id*. at 80. Afterwards, Webb stood up with his back to JE and began asking her why she made him do this; JE used this opportunity to escape out of the backdoor and down the steps to the backyard area where she encountered one of her neighbors. *Id*. at 80-81. JE's neighbor, Sue Ellen Smyth, called the police. *Id*. at 81.

JE's testimony was bolstered by the testimony of Sue Ellen Smyth who recalled that she saw JE at the fence in the back of the houses and described her as very upset, crying, and really distraught. ECF No. 5-7 at 97-98. Ms. Smyth also recalled seeing blood pouring down JE's face and that JE was "so upset that she was babbling" but remembered JE had said that Webb had stabbed her, hit her, and either tried to rape her or raped her. *Id*. at 98.

JE's testimony was also bolstered by the testimony of a registered nurse, Susan Holian, who examined JE after the assault. ECF No. 5-7 at 110. After being qualified as an expert in forensic nursing, Holian stated her opinion, based on the trauma to the vaginal area (swelling and tenderness), that JE was raped. *Id*. At this point during the trial, Webb interjected that JE "was a stripper" and insisted it was the cause of the swelling and tenderness. *Id*. at 110. Because of

Webb's previous disruptions[2] in the proceedings, the State moved to gag him.  *Id*.  The jury was removed from the courtroom and Webb was at that time handcuffed and gagged.  *Id*. at 111.  When the jury returned, the Judge told the jury that if there were any further outbursts, he would simply have Webb removed from the courtroom without removing the jury from the room.  *Id*. at 111-12. Defense counsel advised the court that Webb said he wanted to be taken out of the courtroom at that time. *Id.* The Court obliged, and Webb was removed.  *Id.* at 112.

On the second day of trial, defense counsel told the court that Webb wanted to be present in the courtroom and had given defense counsel assurances that he would behave himself.  ECF No. 5-8 at 2.  The court granted the request over the State's objection and directed Webb be brought into the courtroom in handcuffs.  *Id*. at 3.

Bernard R. Donovan, a Maryland State Trooper, testified about his role in Webb's arrest. He recalled that there was heavy rain on the night of the incident and although he was there to search for Webb using a police dog, a scent could not be tracked.  ECF No. 5-8 at 10.  He stated that after the scene was cleared and all marked police vehicles were gone, he walked to the rear of JE's house to a sidewalk where he saw a man walking towards the front of the house.  *Id*. at 11. Donovan recalled that the clothes the man wore matched the description of Webb, so he called out

---

[2]      Webb attempted to represent himself at a prior trial.  Due to his inappropriate comments to the jury during opening statements, the court declared a mistrial and noted that Webb would have to be represented by counsel in any future proceedings.  ECF No. 5-3 at 40-45.  When the potential jurors were being escorted to the courtroom for the second trial, Webb became angry and threw a cup of water and ice on his attorney. ECF No. 5-7 at 15.  Additionally, the State's Attorney stated, for the record, that during a chambers conference defense counsel had expressed that "he fears that he will be assaulted" during the trial."  *Id*. at 16.

During Webb's pre-trial detention at the Cecil County Detention Center, the staff at the detention center requested that Webb be transferred to Baltimore City Detention Center due to his behavior, which was disruptive to the normal operations of the detention center and continued regardless of any changes to his housing assignments. ECF No. 5-4 at 3-4.  That request was granted by the court.  *Id*. at 7-8.  Based on Webb's combative behavior, he remained handcuffed during the second trial.  ECF No. 5-7 at 15.

Webb's name and Webb turned around. *Id*. at 11-12. Donovan further recalled that Webb's clothes were soaked as if he had been out in the rain for some time. *Id*. at 12.

Richard D. Janney, who is also a Maryland State Trooper, testified about his interview of Webb at the State Police barracks following his arrest. ECF No. 5-8 at 15. Janney stated that he read Webb his *Miranda*[3] rights before Webb made statements regarding the assault. *Id*. Janney read a summary of his report into the record:

> Matthew Webb stated he knows it is wrong to touch a woman, but he was angry. Matthew Webb advised that he knows he is in a lot of trouble, which I quoted him saying, but he insisted he did not rape her. I asked Webb about the knife that was found inside the apartment. Webb put his head into his hands and stated that he did not want to talk about it. Webb asked me on two different occasions if JE okay [sic] and what was the severity of her injuries. Webb stated that he would never have to rape her because he can have sex with her whenever he wants. Webb stated you will get me on the assault, but I will beat the rape charge.

ECF No. 5-8 at 18.

Through the testimony of Dr. Cynthia Zeller and Bruce J. Heidebrecht, DNA evidence was produced. ECF No. 5-8 at 25-31; 35-41. A cutting from the right leg of Webb's jeans, collected at the time of his arrest, rendered a DNA profile that matched JE's profile. *Id*. at 30-40. Additionally, Webb's underwear, which was also collected at the time of his arrest, rendered a DNA mix of JE and Webb. *Id*. at 40-41.

The defense's case consisted of the testimony of Maryland State Trooper James Edward DeCourcey who was the first officer to encounter JE, and the testimony of Webb. ECF No. 5-8 at 54-58; 61-76. DeCourcey confirmed that his report noted that JE's demeanor was "quiet and solemn" when he first interviewed her. *Id*. at 57.

---

[3]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

During his testimony, Webb claimed he did not return to JE's apartment until midnight, right before he got arrested.  ECF No. 5-8 at 68-69.  He stated that he was dropped off up the street from JE's apartment and at that time it was raining really hard.  *Id*. at 69.  Webb recalled that as he walked down the street, two people shined a flashlight on him, asked for his name, and placed him under arrest.  *Id*. at 70.  Webb further claimed that he was not wearing jeans that night; rather he was wearing blue sweatpants as indicated on the property inventory sheet provided to him by the State Police.  *Id*.  Webb did admit however that the jeans introduced into evidence by the State were his size and looked like jeans he owned.  *Id*. at 70-71.

During closing argument, the State's Attorney remarked on the absence of any witness attesting to Webb's version of events, *i.e.*, the friend who drove him to Maryland at midnight.  ECF No. 5-9 at 108.  Webb disrupted the proceedings by interjecting, "Remember, I'm not allowed to call them.  They're not letting me."  *Id*.  When the trial judge warned Webb that he would be removed if he said anything else, Webb asked if he could call a witness.  *Id*.  The trial judge then ordered Webb removed from the courtroom.  *Id*.  As Webb was leaving, he stated in part, "I'm being denied that right.  Why am I being denied it?  Think about it.  Why am I being denied it?"  *Id*. at 109.

On February 13, 2004, the jury returned guilty verdicts on second-degree attempted rape and second-degree sex offense.  ECF No. 5-9 at 2-3.  The jury acquitted Webb on charges of first-degree assault and second-degree rape.  *Id*.  On April 12, 2004, Webb was sentenced to 20 years for the second-degree attempted rape and 10 years consecutive for the second-degree sex offense.  ECF No. 5-10 at 13.

On April 15, 2004, a Motion to Modify, Reduce or Reconsider Sentence was filed and appears to have been left unresolved.  ECF No. 5-1 at 13, *see also* ECF No. 5-1 at 242 (post-

conviction decision stating that a hearing on the motion was held on Feb. 8, 2012 without disposition).

**B.      Direct Appeal**

Webb appealed his conviction to the Maryland Court of Special Appeals and raised three claims: (1) whether the circuit court erred by not permitting Webb to proceed pro se; (2) whether the circuit court denied Webb his right to a fair trial by having him appear in the presence of the jury in handcuffs and a gag; and (3) whether the circuit court erred by ordering Webb's removal from the courtroom during portions of the trial.  ECF No. 5-1 at 108-109.  In an unpublished opinion the Court of Special Appeals affirmed Webb's conviction.  *Id*. at 107-43.  The appellate court summarized all of the proceedings leading up to the jury's verdict and the trial court's decisions regarding Webb's presence in the courtroom.

> At an appearance before the circuit court on July 8, 2002, the public defender representing Webb expressed to the court his serious doubts about Webb's competency to stand trial.  As a result, the court ordered an evaluation by the Department of Health and Mental Hygiene.  A report finding Webb competent was forwarded to the court on July 18, 2002.
>
> Webb's next appearance before the court was September 13, 2002, as a result of his request to discharge his counsel.  Even though Webb sought to discharge his counsel, he affirmed that he did not waive his right to a speedy trial.  In response to the court's inquiry whether he was waiving his right to counsel, Webb, on two occasions, answered: "I am representing myself."   After an exhaustive explanation to Webb of the benefits of counsel, the court concluded that the waiver was intelligently and knowingly made, and permitted Webb to proceed pro se.
>
> *Webb's First Trial*
>
> Webb's case came on for trial on January 6, 2003.  That proceeding was short-lived, as the court ordered a mistrial due to Webb's outbursts during his opening statement.  In relevant part, Webb said to the jury:
>
>> [Webb]: Four months later this is what they come up with; that I admitted to the assault, but I don't admit to the rape.  I've been in jail for the last year now without no bail.

[State's Attorney]: Objection, Your Honor.  Your Honor, I'm going to-

[Webb]: She has kidnapped my daughter.

[State's Attorney]: Your Honor.  Your Honor.  Your Honor.

[The Court]:  Mr. Webb.  Mr. Webb.  Mr. Webb.

[Webb]: This is true.  This is all true.

[The Court]: Listen to me, will you please.  When you – shut up.  When you hear the word "objection," you stop so that we can have a proper record.  And in case we can—

[Webb]:  I'm a little –

[The Court]: You're messing up your own case.

[Webb]:  I'm not familiar – I want the truth to be heard.

[The Court]:  Anything else you want to say?

[Webb]:  I want to say that she had kidnapped my daughter.

[State's Attorney]:  Objection, Your Honor.

[The Court]:  Go ahead, have a seat.  (State's Attorney).

[Webb]:  This is the truth.  Let's get the truth of the facts of the case out, please.

[The Court]: [State's Attorney].

[State's Attorney]:  Your Honor, I'd like you to instruct the jury.

[Webb]:  Instruct them all you want, truth is truth.

[The Court]:  Listen, Mr. Webb.

                              ***

[Webb]:  You're already leading me like a lamb to the slaughter by not giving me a lawyer.  I refuse to keep my mouth shut about the facts of this case.

I want a lawyer.  I told you that.  You're not giving it to me.  I'm going to say the facts of the case.  You contempt me, you do whatever you want, but I'll tell the true facts of this case.  You're not going to deny me all my rights in this case.

[The Court]:  Are you done?

[Webb]: Not going to do it.

[The Court]: Are you done?

[Webb]:  Are yous [sic] done not giving me a lawyer?  Are you done not giving me a fair trial? Are you done?  That's what I'm asking you. Are you people done?  Locking me up for a year.

[State's Attorney]:  I do not see how we can possibly go on.

[Webb]:  Give me a lawyer.  Give me a mouthpiece.  That's all I ask. Can I have a lawyer like every other citizen in the United States?  Why can't Matthew Webb have a lawyer?  Because he would go along with the insane [sic] that the public defender put his name on the –

[The Court]:  Mr. Bailiff, can you shut him up please.

[Webb]:  Let's tell the truth why I don't have a lawyer.  We don't want the truth to get out.  God forbid that.

[The Court]:  I don't have much choice.

[Webb]: I'm telling the truth.  Hey, watch where you touch me.  Watch the way you touch me.  I'm going to tell you right now I'm telling the truth of the case.  If you can't handle the truth, don't have a trial.

***

[The Court]: Because of what's transpired here, a mistrial is declared.

[Webb]:  I'm not going to keep my mouth shut.  I'm going to tell the truth.

ECF No. 5-1 at 110-113 (Ct. of Spec. App. Op.); *see also* ECF No. 5-3 at 40-45 (trial transcript).

After Webb was removed from the courtroom, the State's Attorney stated for the record that he "began physically fighting with the bailiff and another guard in the courtroom in front of the jury and would not listen to the Court nor obey the Court's orders."  ECF No. 5-3 at 46.

The Court of Special Appeals also noted the January 22, 2003 proceeding wherein the Cecil County Detention Center sought to have Webb transferred to the Baltimore City Detention Center due to his behavior.  ECF No. 5-1 at 113; *see also* ECF No. 5-4 at 3-4.  Additionally, prior to Webb's second trial, Webb appeared before the Circuit Court on May 5, 2003, when Webb's counsel requested a full psychiatric evaluation.  ECF No. 5-1 at 114.  While counsel conceded that an "initial screener had found Webb to be competent to stand trial (in July, 2002), he questioned Webb's competency anew and requested a full battery of testing."  *Id.*; *see also* ECF no. 5-6 at 3-5.  Counsel's request was granted but Webb was again found competent to stand trial.  ECF No. 5-7 at 8.

It was against this backdrop, as well as Webb's outbursts during the second trial (*see* ECF No. 5-1 at 114-18), that the Court of Special Appeals found, with respect to Webb's first claim, that Webb had waived his right to self-representation through his misconduct.  *Id.* at 125.  The appellate court noted that:

> Simply put, Webb, unlike the defendant in *Faretta* [*v. California*, 422 U.S. 806 (1975)], consistently engaged in misconduct which eventually led to the forfeiture of his right to self-representation.  Webb's disruptive conduct in the first trial, in which he appeared *pro se*, resulted in a mistrial.  The trial court (Judge Lidums presided at all of the proceedings involving *State v. Webb*) was aware of Webb's misconduct in the detention center, had personally, and unfortunately, experienced Webb's misconduct in the courtroom, and knew of Webb's tussles with the court security staff.  The facts here demonstrate that Webb clearly "engage[d] in a pattern of deliberate, obstructionist misconduct" and "abuse[d] the dignity of the courtroom."

ECF No. 5-1 at 125.  The Court of Special Appeals concluded that "[t]hose factors, . . . were sufficient to allow the trial court to deny Webb's desire to discharge counsel."  *Id.* at 127.

Additionally, in the appellate court's view, the record established that "Webb equivocated on the question of his representation." *Id.*; *see also* ECF No. 5-4 at 8-9.

The Court of Special Appeals also rejected Webb's claim regarding the restraints he was required to wear in front of the jury following his outburst during the testimony of Nurse Holian. The court found that "[t]he record is replete with instances in which Webb was unable, or unwilling, to control himself both inside and outside the courtroom." ECF No. 5-1 at 134. The court also noted that Webb was forewarned that measures would be taken to restrain him or remove him from the courtroom if he continued to behave in a disruptive manner. *Id.* at 135. In the appellate court's view, the Circuit Court's intervention was necessary as "the possibility of another mistrial loomed large." *Id.* at 139.

Webb's third and final claim was also rejected by the Court of Special Appeals. Webb's first removal from the courtroom during the second trial was occasioned by Webb's own request. ECF No. 5-1 a 139. The second time, Webb was removed from the courtroom following his outburst during the State's closing argument. *Id.* While recognizing that a "criminal defendant has the right to be present at every critical stage of his trial," the Court of Special Appeals noted that "the right may be waived." *Id.* (citing *Biglari v. State*, 156 Md. App. 657, 670-71 (2004)). The Court of Special Appeals further noted that the "circuit court made every reasonable effort to minimize Webb's self-inflicted prejudice by the several admonitions to Webb and the explanations to the jury and for the record." *Id.*

Webb did not seek certiorari review from the Maryland Court of Appeals. ECF No. 1 at 3.

C.      **Post-Conviction Proceedings**

On September 20, 2011, Webb filed a petition for post-conviction relief.  ECF No. 5-1 at 14; 145-46.  This petition was denied without a hearing by marginal order dated October 17, 2011 because Webb "fail[ed] to outline in detail facts supporting allegation of error."  *Id*. at 146.

Webb attempted to file another post-conviction petition on November 2, 2011, but that petition was also denied by marginal order dated May 2, 2012.  ECF No. 5-1 at 142-52 (petition); 152 (marginal order).

On February 27, 2012, Webb filed another post-conviction petition.  ECF No. 5-1 at 14; 153-58.  On May 3, 2012, Webb filed another petition for post-conviction which appears to have been left pending without disposition.  ECF No. 5-1 at 14; 168-77.

On October 11, 2017, Webb filed a motion to reopen post-conviction proceedings.  ECF No. 5-1 at 179-82.  On November 20, 2017, the motion was granted ostensibly because Webb had not been provided a post-conviction hearing.  *Id*. at 179.

The Circuit Court for Cecil County held a post-conviction hearing on April 5, 2019.  ECF No. 7-1 at 1-140.  Webb discharged counsel at a prior hearing and proceeded pro se for the post-conviction hearing.  ECF No. 7-1 at 2, 5.  Webb claimed ineffective assistance of counsel for numerous reasons including: counsel's failure to file a motion for modification of sentence in a timely manner (*id*. at 11); counsel's failure to subpoena witnesses for trial[4] (*id*. at 12-14); counsel's failure to raise the felony kidnapping charges that were brought against JE while Webb was incarcerated and awaiting trial[5] (*id.* at 15-17); counsel's statement that he was afraid Webb was

---

[4]      Webb claimed he was thrown out of his own trial for asking, "can I call a witness" while Webb was on the stand testifying.  ECF No. 7-1 at 13.  But the trial court removed Webb from the courtroom when he interrupted the State's Attorney during closing argument.  ECF No. 5-8 at 108-109.

[5]      According to Webb, the State's Attorney made a deal with JE to testify favorably for the State in Webb's trial and the kidnapping charges would be dropped.  ECF No. 7-1 at 15.

going to assault him, which resulted in Webb being handcuffed throughout the trial and creating a conflict of interest and violating Webb's due process rights (*id*. at 21-24); counsel's failure to object to Webb wearing prison clothes at trial even though he told counsel he had clothes at the detention center (*id*. at 24-25); counsel's failure to call the witnesses Webb wanted to call and which would have resulted in a different outcome, and which amounted to the denial of Webb's constitutional right to call witnesses on his behalf (*id*. at 27-30); counsel's failure to visit Webb at Baltimore City Detention Center before trial (*id*. at 40-41); counsel's failure to object to the victim impact statement presented in support of the pre-sentence investigation, which was "full of lies" and was typed up by the State's Attorney's office (*id*. at 45-46); counsel's refusal to argue in a motion to suppress that the State's property inventory sheet did not list jeans as being taken from Webb while in custody (*id*. at 52-54); and counsel's failure to cross-examine witnesses and, when he did, failing to do so competently[6] (*id*. at 54-58).

During the post-conviction hearing, Webb asked trial counsel if he was afraid Webb would assault him on the first day of trial, and counsel answered, "[a]bsolutely." ECF No. 7-1 at 81. Counsel then clarified that he was not so afraid that it interfered with his ability to try the case. *Id*. at 81-82. Defense counsel also testified that Webb had assaulted him twice: "once when you threw the cup of water on me at the trial table, and the second time in the lock up . . . when you spit on me." *Id*. at 91. Counsel recalled that the second assault occurred after the verdict was reached. *Id*. at 92. Further, counsel denied failing to cross-examine JE. *Id*. at 102. Counsel also explained that he did not request subpoenas for witnesses because Webb never told him who the witnesses were, rather, he only provided nicknames of people out of state without addresses or phone numbers. *Id*. at 110.

---

[6]     Webb clarified this claim as asserting that he wanted counsel to ask certain questions of the victim, but counsel refused. ECF No. 7-1 at 55.

The post-conviction court denied relief in a memorandum opinion dated May 21, 2019. ECF No. 5-1 at 234-47.  The court found that some of Webb's claims were waived because they could have been raised on direct appeal but were not.  *Id*. at 239-40.  Specifically, the post-conviction court found that:

> Petitioner alleges he was not permitted to wear civilian clothing.  This is a matter which may have been raised in his appeal to the Court of Special Appeals.  The Court of Special Appeals reviewed issues regarding his removal from the trial and trial judge's decision to handcuff and gag him.  The Court finds that this claim has been waived.  Even if not waived, as set forth hereinafter, Petitioner's claim has no merit.  Petitioner also alleges that his failure to call witnesses was improperly commented upon by the States Attorney because he was not permitted to call witnesses.  The Court finds that Petitioner could have raised this issue in his appeal and therefore it is waived.  Even if not waived, as set forth hereinafter, it has no merit.  Petitioner also alleges that the trial court should have inquired as to Defense Counsel's ability to represent Petitioner after disclosing that he had been assaulted by Petitioner.  The Court finds that Petitioner could have made this claim in his appeal and as such it is waived.  Even if not waived, as set forth hereinafter, the claim has no merit.

ECF No. 5-1 at 239-40.[7]

The post-conviction court further found that Webb was not entitled to post-conviction relief on any of his claims of ineffective assistance of counsel.  *Id*. at 240-44.  With respect to Webb's claim that his attorney failed to request a hearing on a pending Motion for Modification or Reduction of Sentence, the post-conviction court noted that in fact a hearing was held on the motion on February 8, 2012.[8]  *Id*. at 242.

The record also refuted Webb's claim that his attorney failed to litigate a motion to suppress, which in fact was re-argued at a hearing on April 4, 2003.  ECF No. 5-1 at 242.  Because

---

[7]      In discussing the merits of these claims the post-conviction court found that: Webb presented no evidence regarding what he was wearing at the time of trial; there was no evidence he was not permitted to call witnesses;  the State's Attorney's comment about the failure to present exculpatory evidence was not improper; and Webb failed to present evidence that trial counsel was prevented from effectively representing Webb due to Webb's prior assaults on his attorney.  ECF No. 5-1 at 245-46.

[8]      The judge who presided over the hearing took no action on the pending motion to modify or reduce Webb's sentence.  ECF No. 5-1 at 242.

Webb insisted that the motion be argued again despite the court denying the motion previously, defense counsel raised the matter again and the motion was again denied.  *Id*.

The post-conviction court found defense counsel's testimony that Webb never gave him the full names of any of the witnesses he wanted to call to be credible and rejected Webb's denial of counsel's assertion.  ECF No. 5-1 at 242. Also unsupported by the trial transcripts in the post-conviction court's view was Webb's claims that his trial attorney failed to cross-examine witnesses, including the victim.  *Id*. at 243.

Webb's claim that trial counsel should have asked the victim questions related to an alleged plea agreement with the State, which Webb claimed was the impetus behind her allegedly false testimony, was also rejected by the post-conviction court.  ECF No. 5-1 at 243-44.  A bench conference during the trial established "that there had been charges filed against the victim relating to custodial interference involving the victim's mother" but those "charges had been dropped by the State and were in no way relevant to the trial."  *Id*.

Webb's assertion that the victim impact statement submitted in connection with the Pre-Sentence Investigation was written by the State's Attorney "because it was typed" was rejected by the post-conviction court because there was no evidence to support such a contention.  ECF No. 5-1 at 244.

The post-conviction court also found Webb's claim that his attorney failed to properly represent him because he was afraid of him to be without merit.  ECF No. 5-1 at 244.  Defense counsel testified that he was not afraid of Webb and had no ethical conflicts that interfered with his representation of Webb, despite Webb's assaults.  *Id*.

Webb filed an application for leave to appeal the denial of post-conviction relief.  ECF No. 5-1 at 248-65.  Webb raised the following claims: he was "illegally denied the right to obtain

witnesses in his trial" (ECF No. 5-1 at 255-56); he was "thrown out of his own jury trial" (*id.* at 256); he was denied effective assistance of counsel[9] in his postconviction proceedings (*id.* at 257); he was "denied his right to 'due process of law' when an 'off the record' chambers conference was held in his absence at which time defense counsel stated that he was afraid that he was going to be assaulted by the defendant" (*id.* at 258); the trial court "should not have let [Webb's] public defender to continue to represent" him after counsel expressed concern that Webb might assault him during the trial (*id.* at 259); the trial court "failed to inquire into [a] conflict of interest between [Webb] and defense counsel" (*id.* at 259); the State engaged in "prosecutorial misconduct" by falsely reporting that Webb was fighting with the bailiff and court security (*id.* at 260); he was denied the right to call the trial judge, former State's Attorney, and the Assistant State's Attorney who prosecuted his case as witnesses at his post-conviction hearing. (*id.* at 263); and the post-conviction court erred when it did not address Webb's prosecutorial misconduct allegation." (*id.* at 264).  The application was denied on October 15, 2019.  *Id.* at 266-68.

### D.    Federal Habeas Petition

In the petition pending before this Court, Webb alleges that he was denied the right to call witnesses for his trial and that he was thrown out of the trial when he asked the judge if he could call a witness.  ECF No. 1 at 8.  Webb also alleges that the trial court erred when it did not allow him to be present during testimony, closing arguments, and jury instructions, and denies ever asking to leave the courtroom.  *Id.*  He further claims he was denied his right to a fair trial due to being handcuffed throughout the trial in front of the jury.  *Id.*  Lastly, Webb asserts he was denied the right to represent himself at trial.  *Id.*

---

[9]     Webb proceeded *pro se* at his post-conviction hearing.

Respondent asserts that because Webb failed to present the four claims raised in this Court in a petition for writ of certiorari to the Court of Appeals as a part of his direct appeal, the claims are procedurally defaulted.  ECF No. 5 at 21.  In the alternative, Respondent maintains that if Webb's claims are generously construed as allegations of ineffective assistance of counsel, "two of his claims are still unexhausted and all of them are meritless."  *Id*. at 22.

## STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings."  *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005).  The standard is "difficult to meet," and requires courts to give state-court decisions the benefit of the doubt.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted); *see also White v Woodall,* 572 U.S.415, 419-20 (2014), quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011) (state prisoner must show state court ruling on claim presented in federal court was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement.").

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits: 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  A state adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts

facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101. Thus, "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly.*"* *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are factual determinations for purposes of Section 2254(e)(1)." *Id.* at 379.

Where a petitioner has failed to present a claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal, the procedural default doctrine applies. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (failure to note timely appeal); *Murray v. Carrier*, 477 U.S. 478, 489-91 (1986) (failure to raise claim on direct appeal); *Murch v. Mottram*, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction); *Bradley v. Davis*, 551 F. Supp. 479, 481 (D. Md. 1982) (failure to seek leave to appeal denial of post-conviction relief). A procedural default also may occur where a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent state procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999).

The Fourth Circuit has explained:

> If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim. *See Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). A procedural default also occurs when a habeas petitioner fails to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n.1.

*Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits, or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, *i.e.* the conviction of one who is actually innocent.[10] *See Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Breard*, 134 F.3d at

---

[10] Habeas petitioners may use an actual innocence claim to excuse the procedural default of a separate constitutional claim upon which they request habeas relief. *See Murray v. Carrier*, 477 U.S. at 496. "[When] a

620. "Cause" consists of "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim in state court at the appropriate time." *Id.* (quoting *Murray*, 477 U.S. at 488). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U S. 298, 314 (1995).

When a petitioner alleges a claim of ineffective assistance of counsel, he must show that counsel's performance was deficient, and the deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With regard to the first prong, the petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness." *Id.* at 688; *see Harrington*, 562 U.S. at 104. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690). The Supreme Court explains that the "first prong sets a high bar." *Buck v. Davis*, ___ U.S. ___, 137 S.Ct. 759, 775 (2017). Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the wide range of professionally competent assistance." *Id.* (internal quotation and citation omitted). The standard for assessing such competence is "highly deferential" and there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 669.

Second, to satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.*; *see also Reid v. True*, 349 F.3d 788, 806 (4th Cir. 2003). Petitioners who wish to use a claim of actual innocence as a gateway to raising an otherwise defaulted constitutional claim must demonstrate by a preponderance of the evidence that a reasonable juror could not have convicted the petitioner in light of the new evidence. *See Buckner v. Polk*, 453 F.3d 195, 199-200 (4th Cir. 2006).

been different." *Id.* at 694; *see also Buck*, 137 S.Ct. at 776. "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. A petitioner alleging ineffective assistance of counsel must show that the proceeding was rendered fundamentally unfair by counsel's affirmative omissions or errors. *Id.* Thus, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. A petitioner is not entitled to post-conviction relief where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

In evaluating whether the petitioner has satisfied the two-pronged test set forth in *Strickland*, a court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## DISCUSSION

### A.      Right to Call Witnesses

Webb asserts that he told the trial judge before the trial started that his attorney had not subpoenaed witnesses he needed for trial and that when he asked the judge if he could call a witness, the judge threw him out of his own trial. ECF No. 1 at 8. Respondent asserts that this claim, which is actually an allegation of trial court error, is procedurally defaulted because it was

not raised in a petition for writ of certiorari to the Maryland Court of Appeals in connection with

Webb's direct appeal.  ECF No. 5 at 22-23.  In the alternative, Respondent asserts this claim is

without merit.  *Id*. at 23-24.  In rebuttal, Webb asserts that this claim is an ineffective assistance

of counsel claim.  ECF No. 15-1 at 3-4.  Webb adds that if this Court does not reach the merits of

this claim it will result in the continued imprisonment of one who is actually innocent.  ECF No.

15 at 2.

    While none of Webb's pleadings are a model of clarity, he has sought to clarify this claim

as one asserting ineffective assistance of counsel.  The post-conviction court analyzed the claim

both as an allegation of trial court error that was waived and as an allegation of ineffective

assistance of counsel.  ECF No. 5-1 at 240; 242-43.  As a trial court error, the post-conviction court

read the claim as asserting that the State's Attorney improperly commented on the failure to call a

witness during closing argument.  *Id*. at 240.  Because this claim could have been raised on appeal,

the post-conviction court found that Webb had waived the claim.  *Id*.

    To the extent that Webb placed blame on defense counsel for failing to subpoena witnesses,

the post-conviction court found counsel's testimony that Webb had failed to provide him with the

full names and addresses of the putative witnesses or to give him the name of someone who could

provide it credibly.  ECF No. 5-1 at 242-43.  Specifically, the post-conviction court observed:

> Mr. Winkler, Esquire, testified that Petitioner had asked him to subpoena
> witnesses.  He testified that. Petitioner was unable to give him names or
> addresses of witnesses.  He could only provide nicknames and did not provide
> addresses.  Mr. Winkler testified that he asked Petitioner for this information or
> for the name of another person who may be able to help him get the information
> but Petitioner never provided it.  The Court finds the testimony of Mr. Winkler
> to be credible.  The Court finds Petitioner's claim is without merit and is not
> supported by facts.

*Id*. at 243.  Webb assigns error to this analysis because he presented the post-conviction court with

a list of the witnesses he wished to call, along with their addresses.  ECF No. 15-1 at 5-7; ECF No.

15-2 at 8-10; ECF No. 15-3 at 1 (list of witnesses).  What apparently escapes Webb's attention is

the fact that he is now able to produce a list of witnesses along with their addresses has no bearing

on whether he provided that information to defense counsel prior to trial.  Further, even if counsel's

performance was deficient in this regard (it is not), it would not have made any difference in light

of all the other evidence of Webb's guilt which included DNA evidence.  Habeas relief is

unavailable on this claim.

**B.      Right to be present during trial**

Webb claims that the trial court allowed critical portions of the trial to proceed without his

presence in the courtroom and that he "never asked to be removed from the trial" as stated by

counsel during the proceedings.  ECF No. 1 at 8.  Respondents assert that this claim is procedurally

defaulted because Webb failed to raise it on direct appeal.  ECF No. 5 at 23-24.  I agree with

Respondent's view.[11]  Trial court error must be raised on direct appeal.  *See* Md. Code Ann., Cts

& Jud. Proc. §§ 12-301, 12-307, 12-308.  Although Webb raised a claim that the trial court erred

when it removed him from the courtroom in his appeal to the Court of Special Appeals, he did not

present the claim to the Court of Appeals.  To properly exhaust a claim for purposes of federal

habeas review, a petitioner must show that all of his claims have been presented to the state courts.

28 U.S.C. § 2254(b) and (c); *see also Preiser v. Rodriguez*, 411 U.S. 475, 491 (1973), *Mallory v.*

*Smith*, 27 F.3d 991, 994 (4th Cir. 1994) (petitioner bears the burden of demonstrating state

remedies have been exhausted).  This exhaustion requirement is satisfied by seeking review of the

claim in the highest state court with jurisdiction to consider it. *Id.*

Where, as here, an unexhausted claim can no longer be presented to the state courts, the

claim is procedurally defaulted.  *See Murray*, 477 U.S. at 489-91.  Webb invites this Court's

---

[11]      Webb attempts to convince the Court that Respondent has admitted that his conviction was illegal by stating
his claim is "provable" on the trial record.  ECF No. 15-2 at 4.  Webb is mistaken.

scrutiny of the claim notwithstanding the procedural default because he claims he is actually innocent.  "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (emphasis in original).  The merits of a petition which is procedurally barred, may be reached if "new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'"  *Id.* at 395, quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995).  Webb cites no new evidence in support of his conclusory claim of actual innocence.  His repetitive assertions that had the trial been conducted as he would have liked the result would have been different are speculative at best and do not amount to a credible claim of actual innocence.  Federal habeas relief is unavailable on this claim.

## C.    Conflict of Interest Claim

Webb asserts that the trial court's decision to have him handcuffed in front of the jury during the trial was the result of defense counsel telling the trial judge that he feared he would be assaulted by Webb during the trial.  ECF No. 1 at 8.  Webb expanded upon this claim during his post-conviction hearing, alleging that counsel's fear of being assaulted created a conflict of interest that prohibited counsel from providing effective representation.  ECF No. 7-1 at 20-24; ECF No. 15-3 at 2 & 3.  Respondent asserts this claim is actually an allegation of trial court error and as such is procedurally defaulted.  In the alternative, Respondent asserts if the claim is construed as one asserting ineffective assistance of counsel, it is without merit.

The post-conviction court addressed this claim as one asserting ineffective assistance of counsel.  To the extent that Webb faults defense counsel for failing to recuse himself from representing Webb because he expressed concern over the possibility of being assaulted by Webb, the post-conviction court found counsel's testimony that he did not suffer from such a conflict of

interest credible.  Specifically, counsel testified that he was concerned about Webb assaulting him again, but he was not afraid of Webb nor was his ability to advocate for Webb at trial adversely affected.  Indeed, Webb was acquitted of the most serious of the charges against him.

There is no evidence in the record before this Court, nor does Webb present any evidence, that trial counsel's supposed fear of Webb caused counsel's performance to drop below that which is constitutionally acceptable.  Further, the post-conviction court's factual determination that defense counsel was credible in his testimony was not unreasonable.  "The role of a federal habeas court is to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings . . .." *Davis v. Ayala*, 135 S.Ct. 2187, 2202 (2015) (citations and quotation marks omitted), *see also Merzbacher v. Shearin*, 706 F.3d. 356, 367 (4th Cir. 2015) (credibility determinations are factual findings).  Relief on this claim is denied.

**D.     Right of Self-Representation**

Webb claims he was denied the right of self-representation after he "clearly articulated that [he] was not being represented properly and that [he] wanted to represent [him]self."  ECF No. 1 at 8.  Webb expands on this claim in his response, stating that he was forced to go to trial with an attorney who had failed to subpoena his witnesses and to meet with him pre-trial.  ECF No. 15-3 at 29-30.  In a pre-trial hearing, Webb claimed that counsel had not come to see him at the Baltimore City Detention Center where he was being held.  ECF No. 5-7 at 3.  According to Webb, this resulted in the defense being unprepared to proceed to trial.  *Id*.  Webb asked the trial court to discharge counsel and the court denied the request.  *Id*. at 5.  Defense counsel assured the court that he had met with Webb on numerous occasions in the Cecil County Detention Center and at the courthouse to discuss the case.  *Id*. at 3-4.  He further assured the court that he was prepared for trial.  *Id*.

To the extent this claim is properly raised,[12] it is without merit.  The Court of Special Appeals addressed Webb's claim that he was improperly denied his right of self-representation, noting that the facts here demonstrate that Webb clearly "engage[d] in a pattern of deliberate, obstructionist misconduct" and "abuse[d] the dignity of the courtroom."  ECF No. 5-1 at 125. Additionally, the record established that "Webb equivocated on the question of his representation." *Id.*; *see also* ECF No. 5-4 at 8-9.  It is axiomatic that where, as here, a criminal defendant's own behavior resulted in a waiver of his constitutional right to self-representation, neither defense counsel's performance nor the trial court's measures to ensure a trial without disruption can be faulted.  *See, e.g., United States v. Underwood*, 726 F. App'x 945, 950 (4th Cir. 2018).  In short, it was Webb's own disruptive, aberrant behavior, well documented in the record of this case, that was the cause for changes in normal trial procedures.  Accordingly, federal habeas relief on this and all other claims is denied.

## Conclusion

Having found that the Petition for Writ of Habeas Corpus does not present a claim upon which federal habeas relief may be awarded, this Court must consider whether a certificate of appealability should issue.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U. S.C. § 2253(c)(2); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017).  The petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  Because this Court finds that there has been no substantial showing of the

---

[12]     In his response to the Answer, Webb conflates this claim with several others.

denial of a constitutional right, a certificate of appealability shall be denied.  *See* 28 U. S.C. § 2253(c)(2).  Webb may still request that the United States Court of Appeals for the Fourth Circuit issue such a certificate.  *See Lyons v. Lee*, 316 F.3d 528, 532 (4th Cir. 2003) (considering whether to grant a certificate of appealability after the district court declined to issue one).

A separate Order follows.


___4/7/2022_____                         _____/S/_____
Date                                                         Paul W. Grimm
                                                                United States District Judge